# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DR. MICHELLE G. SCOTT,**

      **Plaintiff,**

**v.**                                                  **Case No.  8:14-cv-1762-T-30TBM**

**SARASOTA DOCTORS HOSPITAL, INC.,**
**WEST FLORIDA PHYSICIAN NETWORK,**
**LLC, and EMCARE, INC.,**

      **Defendants.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant Sarasota Doctors Hospital, Inc.'s Motion for Summary Judgment (Dkt. 64), EmCare, Inc.'s Motion for Summary Judgment (Dkt. 66), and Plaintiff's Responses in Opposition thereto (Dkts. 78, 79).  The Court, having reviewed the motions, responses, record evidence, and being otherwise advised in the premises, concludes that the Hospital's motion should be denied and Emcare's motion should be granted.

## SUMMARY

Plaintiff Dr. Michelle G. Scott alleges gender discrimination and retaliation under Title VII and the Florida Civil Rights Act ("FCRA") against Defendants Sarasota Doctors Hospital, Inc. and Emcare, Inc. related to the Hospital's request to have Scott removed from

working at the Hospital and Emcare's subsequent termination of its contract with Scott. Both Defendants move for summary judgment.[1]

The Court concludes that there is an issue of fact on the gender and retaliation claims against the Hospital because Scott has pointed to sufficient evidence to make the issue of discriminatory intent one for the jury—Scott has shown that the Hospital treated a similarly-situated male doctor more favorably. The Court also concludes that, although the Hospital maintains that it was never Scott's employer, the Court cannot decide this issue as a matter of law because there are genuine issues of fact on whether the Hospital and Emcare acted as Scott's joint employer. There is also evidence suggesting that the Hospital interfered with Scott's employment relationship with Emcare, which is another basis to hold it responsible for the alleged discriminatory acts.

The Court concludes that Emcare is entitled to summary judgment on Scott's retaliation claim (the only claim Scott asserts against Emcare) because Scott fails to show *any* evidence of pretext to call into question Emcare's legitimate, nondiscriminatory decision to remove her from the Hospital and terminate her contract. It is undisputed that Emcare was required to remove Scott from the Hospital at the Hospital's request per the applicable contract. It is also undisputed that Emcare was contractually permitted to terminate Scott's employment with Emcare. Scott does not point to anything in the record that shows or even

---

[1] Defendant West Florida Physician Network, LLC was dismissed with prejudice per the parties' Joint Motion to Dismiss (Dkt. 87).

suggests that Emcare's acts were related to the EEOC charge that Scott filed against the Hospital.

The Court now turns to the relevant facts.

## RELEVANT FACTS[2]

Plaintiff Dr. Michelle G. Scott is a medical doctor, specializing in internal medicine. During the relevant time, she practiced as a hospitalist. A hospitalist operates as a hospital-based "primary care physician," admitting patients and managing their treatment during hospital stays.

In July 2011, Scott relocated to Florida from Chicago, Illinois. On November 1, 2011, Scott entered into an employment agreement with Inpatient Services of Florida. Defendant Emcare, Inc. provides management services to Inpatient Services, including management of Inpatient's employment relationships with providers. Emcare is a healthcare company that contracts physician services to various healthcare entities and provides professional services and various specialties. The record is undisputed that Inpatient, who is not a party in this action, played no role in Scott's employment.

In November 2011, Emcare assigned Scott to work at Defendant Sarasota Doctors Hospital, Inc. ("Hospital") as a full-time hospitalist physician. Dr. Michael Schandorf is EmCare's site medical director for hospital medicine; he was Scott's supervisor during the relevant time. Schandorf's responsibilities included managing the full-time hospitalists. He

---

[2] These facts are interpreted in a light most favorable to Scott, the non-movant.

also administratively made sure that Emcare's programs, as well as the Hospital's programs, were implemented.  He was also involved in corrective or administrative action to correct any problems between physicians and patients.  Schandorf played several roles in the hospital administration as well.  He conducted Scott's initial interview.  After determining that she was a good fit for the Hospital, he recommended that the Hospital's administrative team interview her.  Robert Meade is the Hospital's CEO.  He attended Scott's interview and approved her employment at the Hospital.

Scott and the other physicians and medical staff placed at the Hospital by Emcare were reviewed by an evaluation committee that was comprised of individuals from Emcare and the Hospital.  The record reflects that the Hospital completed "Ongoing Professional Performance Evaluations" of Scott related to her employment.  Meade and Schandorf frequently communicated about the hospitalists' performance and any complaints received about them.  Schandorf served on the evaluation committee, which met on a  monthly basis. Meade was on this committee.  They, among other members of Emcare and the Hospital, discussed hospital metrics, physician performance, and staffing issues.  They had a "collaborative approach" to solving any problems.  (Schandorf at 18:4-13).

Scott worked at the Hospital, seven days on, seven days off, for a minimum of 180 hours per month.  Her typical day was described as arriving at the Hospital at 7:00 a.m., reviewing labs from the day before, reviewing patients' medical status from the prior night, reviewing x-rays, and seeing and admitting patients.  She would see between 18 and 24 patients a day.  She was also on the Hospital's infectious disease committee, the patient care

review committee, and, for a brief time, the cardiac surgery committee.  Other than her medical scrubs, which Emcare provided, the Hospital provided Scott any equipment, medications, supplies, and materials that she needed.  Emcare, not the Hospital, provided Scott with all of her compensation and benefits.  Scott testified that Emcare, not the Hospital, was her employer.

Schandorf interacted with Scott frequently—he testified that she was "a very experienced physician" and that she "knew what to do at a hospital."  (Schandorf at 30:10-13).

In early 2012, Schandorf began receiving informal complaints about Scott that were of a general nature and mostly related to Scott sometimes acting abrupt, or too curt with patients and nurses.  Schandorf did not view the complaints as egregious; rather, they mostly related to the stressful environment that could cause a physician to act curt, abrupt, or rude.  The complaints were unrelated to Scott's medical knowledge or how she was managing patients.  Schandorf did not view the complaints as significant enough to report to the evaluation committee.

Schandorf and Meade had multiple conversations about Scott during Scott's employment at the Hospital.  Meade was aware of the informal complaints about Scott from other physicians and Hospital staff.  Specifically, Meade made his rounds once a week and heard complaints from others concerning Scott's curt and rude behavior.  He relayed two complaints about Scott to Schandorf that Schandorf was unaware of regarding Scott's treatment of a cancer patient and Scott's interaction with a nurse.  As a result of these two

complaints and the prior informal complaints, Meade had serious concerns about Scott being a good fit at the Hospital.   Schandorf told Meade that he would talk to Scott about the incidents.

As promised, Schandorf then talked to Scott about the two incidents.   Scott testified that this conversation occurred in February 2013.   She testified that Schandorf "gingerly" approached her and said: "Bob Meade wants you gone."   (Scott at 60:18-21).   Scott asked Schandorf to explain and Schandorf relayed the two incidents regarding the cancer patient and another incident that a physician witnessed and described as "just awful" but Schandorf did not explain the details of that incident further.   (Scott at 68:13-18).

With respect to the cancer patient, Scott explained to Schandorf that the patient was 83 years-old and was diagnosed with extremely advanced myelodysplastic syndrome, a condition that left the patient with no appreciable bone marrow.   Scott referred the patient to an oncologist who had previously treated the patient.   The oncologist recommended an aggressive regimen of chemotherapy that would not, according to Scott, "save the woman in any way, shape, or form" and, in fact, was "hastening [the patient's] demise and making her very miserable."   (Scott at 64:19 - 65:4).   Scott advised the patient of the true nature of her illness and told her that the chemotherapy would not be able to cure the underlying disease.   Scott testified that the patient was in denial about her condition and Scott was attempting to help her die with peace and dignity.

Scott admitted that her conversation with the patient upset the patient greatly.  As a result, the oncologist complained to Meade and requested that he replace Scott with another hospitalist for that patient.  The oncologist never discussed the matter directly with Scott.

After Scott explained the situation to Schandorf, Schandorf sympathized with Scott's position and acknowledged that the oncologist in question was "known to be extremely aggressive with chemotherapy" and "not to always give the details to the patients."  (Scott at 66:10-16).

With respect to the second incident, Scott did not remember a specific incident related to her treatment of a nurse.  Scott did tell Schandorf that she was under stress and that it was possible that she got upset at a nurse because her job was very stressful.  Scott also testified that at some point she had been upset at a nurse because the nurse lied to her about a patient.  But Scott stated that she did not raise her voice and she and the nurse actually had a "fabulous relationship."  (Scott at 72:14-15).

Schandorf testified that, following his discussions with Meade and Scott about the incidents with the oncologist and nurse, he and Meade may have had other conversations about Scott but no specific conversation stood out in his mind.  Schandorf testified that he liked Scott, thought she was a "great team player" and an "excellent physician" who "did whatever [he] asked her to do and more."  "[He] didn't want to lose her."  (Schandorf at 66:19-22).  Because he did not want to lose her, he considered an alternative arrangement: Scott could transition to a full-time hospitalist position at Blake Medical Center, where he and Scott were already working together in a part-time capacity.

Schandorf testified that Scott did not seem interested in a full-time position at Blake. Schandorf then shared with Scott that he was going to recommend that a full-time hospitalist replace Scott at the Hospital and then Scott could move into a part-time position at the Hospital. Schandorf hoped this arrangement "would help solve the problem." (Schandorf at 68:2-3). Scott could then work part-time at the Hospital and Blake. Although Schandorf did not think that the Hospital wanted Scott fired at this time, it was clear to Schandorf that the Hospital, particularly Meade, did not think that Scott fit the Hospital's culture.

According to Scott, she did not discuss any further issues with Schandorf about her employment at the Hospital after their February conversation other than Schandorf generally repeating that Meade wanted her fired from the Hospital. She also did not receive any additional complaints about her behavior. On August 1, 2013, however, she received an e-mail from Schandorf stating that she was going to be replaced by another doctor, Steve Unaeze, and would assume an as-needed position at the Hospital as of August 31, 2013.

After Scott received the August 1, 2013 e-mail, she testified that she did "nothing" in response to the e-mail, although she did have conversations with Schandorf and it appeared that Meade was maybe on the fence about her and Scott was hoping that Meade would move on and get over any earlier concerns that he had about her.

At some point after she received the August 1, 2013 e-mail, Schandorf informed Scott that Unaeze, the doctor that was going to replace her, reneged on his contract. As such, Scott was permitted to stay at the Hospital full-time. Then, about a week or two later, Schandorf approached Scott and informed her that he was interviewing another male doctor to replace

her.  Scott was upset and asked Schandorf: ". . . are they interviewing for my job still?  Are you kidding me?"  And [Schandorf] said "Yes."  (Scott at 82:16-22).  Scott then had a long conversation with Schandorf about how she believed the Hospital treated other male physicians more favorably and, in her opinion, this difference in treatment was based on her gender.

Specifically, Scott and Schandorf talked about another male doctor, also placed at the Hospital by Emcare, "Dr. M."  Scott was aware that Dr. M. had behavior issues during his employment at the Hospital.  Dr. M., however, was sent to anger management classes.  When the classes did not correct Dr. M.'s behavior, he was provided a ninety-day termination notice and then fired.

Schandorf and Meade testified that there were similar concerns about Scott and Dr. M.  Schandorf described the complaints about Dr. M. as follows: "Generally it had to do with angry outbursts, use of sometimes offensive language or foul language directed at staff, threatening nature, those sorts of things."  (Schandorf at 60:1-4).  Dr. M. was discussed at the level of the evaluation committee.  The discussions related to how Dr. M. interacted with people, the language he used, and his angry outbursts that were "sometimes threatening . . . to the extent that the nurses were afraid to call him in the middle of the night because they were afraid of how he would respond to them."  (Schandorf at 61:2-25).  Dr. M.'s behavior impacted patient care.  Schandorf stated that he could not recall any complaints about Scott's behavior that impacted patient care.

Schandorf discussed Dr. M.'s behavior and the complaints about him with Meade "multiple times"; Meade did not offer any suggestions as to how to deal with Dr. M. and deferred entirely to Schandorf to handle the complaints.   (Schandorf at 83:1-17).   It is undisputed that, although the Hospital was fully aware of the complaints about Dr. M., the Hospital did not play any role in the ultimate decision to terminate Dr. M.

In addition to Scott's belief that Dr. M. was treated more favorably than she, to the extent that he was provided opportunities to correct his behavior, Scott also told Schandorf that, during her time on the patient care review committee, she reviewed multiple complaints about male physicians for behavior, such as not signing charts, being late, etc., and that these physicians were provided an opportunity to respond to the complaints.  Scott, in comparison, was never given a formal complaint about her behavior or provided the opportunity to respond to any complaints.

Regarding her belief that her gender was the reason why she was being treated differently, Scott testified that Schandorf responded that "they" could fire her "at will." (Scott at 84:5-6).

After this conversation with Schandorf, Scott contacted a lawyer and decided to file a charge of gender discrimination against the Hospital.  Specifically, on September 23, 2013, Scott's charge was filed with the Florida Commission on Human Relations.  The charge was solely against the Hospital for gender discrimination.  The charge stated that Meade was subjecting her to gender discrimination to the extent that he was treating her differently than male comparators with respect to the conditions of her employment.

The record is undisputed that Scott did not file a charge of gender discrimination against Emcare. And Scott testified consistently during her deposition that she was not pursuing a gender discrimination claim against Emcare.

On October 3, 2013, Scott returned to the Hospital, after being seven days off per her typical work schedule. That morning, Schandorf approached her and suggested that she take an open hospitalist position that had become available in Venice, Florida. Scott asked Schandorf if he was aware of her September 23 charge against the Hospital and asked him if the Hospital was taking it seriously. Schandorf told her that he was not aware of the September 23 charge.

Scott, upset that the Hospital was not investigating her charge, called her lawyer and, on her lawyer's advice, went to the Hospital's human resources department ("HR"). Scott asked June Ripley, the Hospital's HR generalist about the charge and Ripley told her that she did not know about it. Scott told Ripley about the charge and encouraged her to investigate it. Scott acknowledged that she was upset during this conversation with Ripley. She said the conversation lasted maybe five or ten minutes. Scott then returned to work.

Later that day, Schandorf approached Scott and told her that Meade instructed him to escort her out of the building and take her badge based on something that happened in the HR office. While they were walking out, Schandorf asked her what happened in HR. Scott said that she had complained that HR was not investigating her charge of discrimination. According to Scott, Schandorf said: "Michelle, we weren't going to fire you anyway." (Scott at 99:10-11). Scott then left the Hospital.

The next day, on October 4, 2013, Scott received a telephone call from Ted Haumesser, Emcare's director of client administration.  Haumesser informed Scott that Emcare was firing her.  Scott then asked him if he was aware that she had filed an EEOC charge against the Hospital and Haumesser responded "I don't know anything about that and I don't care."  Scott responded that she would add Emcare to the lawsuit.  (Scott at 100:18-24).

After the telephone conversation with Haumesser, Scott received a termination letter from Emcare that stated, in relevant part:

> Due to the ongoing behavioral concerns and your contentious interactions with staff and patients, this letter shall constitute formal notice of Company's decision to terminate your Agreement pursuant to Section 10.A.(iii).9, which authorizes the Company to terminate the Agreement upon request from the hospital.  Your termination will be effective on October 3, 2013.

(Scott at Ex. 7).

On October 7, 2013, Scott filed an additional charge against the Hospital and her first charge against Emcare for retaliation related to her termination.  This action then followed.

The Hospital contends that the prior complaints about Scott, coupled with the HR incident, prompted Scott's termination.  Specifically, after Scott left the HR office, Ripley reported her interaction with Scott to Theresa Levering, the Hospital's vice president of HR.  Notably, at that time, Levering was aware of the EEOC charge.  And it is undisputed that Levering had told Meade about the charge and that he was specifically named in it.

After meeting with Levering and talking with Ripley, Meade called Joel Stern, Emcare's executive vice president who managed Emcare's contracts with hospitals,[3] and asked him to have Scott permanently removed from the Hospital because Scott had engaged in inappropriate behavior in the Hospital's HR department.  In a follow-up e-mail to Stern, Meade stated: "Due to ongoing behavior issues with [Scott], I am requesting that she be removed from our facility.  Her behavior in our HR department this morning coupled with numerous contentious interactions with staff and patients lead us to believe that she is not a fit with our culture here at [the Hospital]."  (Stern at Ex. G).

The record reflects that the contract between Emcare and the Hospital required Emcare to remove any medical provider from the Hospital at the Hospital's request.  The record also reflects that Scott's agreement with Emcare authorized Emcare to terminate the agreement with Scott immediately "[i]n the event that the appropriate authorities of a hospital at which Employee is providing services request that Employee no longer provide such services at the hospital."  (Declaration of John M. Barr at Exhibit 1, p. 10).  It is undisputed that the Hospital never requested that Emcare remove Dr. M. from the Hospital.

The Court now turns to the relevant law.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

---

[3] Notably, Stern and Meade would talk every two weeks, if not more, about recruiting, staffing, and performance, related to the operations of the hospitalist and emergency medicine service lines.  He was one of the primary contacts between Emcare and the Hospital.

show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor.  *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324.  The evidence must be significantly probative to support the claims.  *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990).  "[I]f factual issues are present, the Court must deny the motion and proceed to trial."  *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 248;

*Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a jury question.  *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.      The Hospital's Argument That It Was Not Scott's "Employer"

The Hospital argues that it is entitled to summary judgment on all of Scott's claims because it was not Scott's employer.  Title VII, by its terms, applies only to "employees," 42 U.S.C. § 2000e(f), but the statute defines an employee circularly as "an individual employed by an employer."  *Id.*  "Based in part on a doctor's ability to control the manner in which the doctor provides his or her services, many circuits evaluating employment discrimination claims by doctors against hospitals have found that the doctors were independent contractors and not employees."  *Ashkenazi v. S. Broward Hosp. Dist.*, 607 F. App'x 958, 962-63 (11th Cir. 2015) (listing cases).

To analyze whether an employment relationship exists, courts consider the following factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated, *i.e.,* by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the

worker accumulates retirement benefits; (10) whether the 'employer' pays Social Security taxes; and (11) the intention of the parties.

*Pardazi v. Cullman Med. Ctr.*, 838 F.2d 1155, 1156 (11th Cir. 1988). "[N]o one factor is determinative." *Ashkenazi*, 607 F. App'x at 962. "A doctor's exercise of professional judgment about a patient's medical care is not a dispositive factor in this analysis; otherwise, all physicians would be 'carve[d] out, ... as a category, from the protections of the antidiscrimination statutes.'" *Id.* (quoting *Salamon v. Our Lady of Victory Hosp.,* 514 F.3d 217, 228-29 (2d Cir. 2008)). "The extent of the employer's right to control the 'means and manner' of the worker's performance is the most important factor to review." *Id.*

Further, the Eleventh Circuit has also instructed that when discrimination is based on an adverse employment decision, the district court must look beyond a mere corporate shield and analyze a joint employer theory that "concentrate[s] on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based." *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998).

Finally, Title VII makes it unlawful for an employer to "discriminate against any *individual* with respect to his compensation, terms, conditions, or *privileges of employment*." 42 U.S.C. § 2000e-2(a) (emphasis added). "It is clear from the language of the statute that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." *Zaklama v. Mt. Sinai Med. Ctr.,* 842 F.2d 291, 294 (11th Cir. 1988). Therefore, courts have found that the statute extends to the situation in which a defendant controls, and has interfered with, an individual's

employment relationship with a third party. *See id.;Pardazi v. Cullman Med. Ctr.,* 838 F.2d 1155, 1156 (11th Cir. 1988) (permitting the plaintiff to proceed with his claim that the defendant hospital interfered with his employment opportunities with a third party professional corporation).

Analyzing the evidence in a light most favorable to Scott, there is certainly an issue of fact on the issue of whether the Hospital and Emcare operated as a single employer with respect to Scott. The Hospital and Emcare jointly hired Scott as a hospitalist. The Hospital and Emcare met frequently to discuss the hospitalists' (and Scott's) performance. The Hospital reviewed Scott's performance and Emcare relied on the Hospital to monitor the performance of the Emcare-placed physicians. Scott served on three of the Hospital's committees. The Hospital and Emcare collaborated on any problems/concerns dealing with the hospitalists. Meade and Schandorf testified, at length, about this collaborative approach and their joint management of Scott and other Emcare-placed physicians.

The Hospital also exercised tremendous countrol over the adverse employment action that is the subject of this lawsuit. It is undisputed that Meade made the decision to have Scott removed from the Hospital. Meade's actions resulted, not only in Scott's removal from the Hospital, but in the termination of her contract with Emcare. These facts are sufficient to create an issue of fact on whether the Hospital can be treated, for all intents and purposes, as Scott's "employer." Accordingly, the Hospital's motion is denied with respect to this issue.

II.   **Scott's Gender Discrimination Claims against the Hospital**

A.   **Relevant Law**

The Hospital argues that, even assuming for the sake of argument that it was Scott's employer during the relevant time, Scott's gender discrimination claims fail as a matter of law.  Title VII and the FCRA prohibit employment discrimination on the basis of race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1); Fla. Stat. § 760.10(1).  A plaintiff may establish a prima facie case of discrimination through either direct or circumstantial evidence.  *See Jackson v. Rooms To Go, Inc.*, No. 8:06-cv-01596-T-24EAJ, 2008 WL 2824814, at *5 (M.D. Fla. July 21, 2008) (citing *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)).  Because the record is clear that there is no direct evidence of discrimination, Scott must prove her claim through the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under this framework, Scott must first establish a prima facie case of employment discrimination.  *See id.*  If Scott establishes a prima facie case, the burden then shifts to the Hospital to articulate some legitimate, nondiscriminatory reason for the employment action. *Id.*  If the Hospital meets this burden of production, the presumption of discrimination raised by Scott's prima facie case is rebutted.  *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981).  Scott must then show that the Hospital's proffered legitimate, nondiscriminatory reason is pretextual.  *Id.*

**B.     Prima Facie Case**

In order to establish her prima facie case of gender discrimination, Scott must show that: (1) she is a member of a protected class (female); (2) she was qualified to perform her job; (3) she suffered an adverse employment action; and (4) the Hospital treated similarly-situated males more favorably.  *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 842-43 (11th Cir. 2000).

The Hospital assumes that Scott can establish the first three factors; the Hospital argues, however, that Scott cannot show that the Hospital treated a similarly-situated male more favorably.  The Court disagrees.  In the context of disciplinary action, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999).  "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Holified v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Rioux v. City of Atlanta, Ga.,* 520 F.3d 1269, 1281 (11th Cir. 2008) ("The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed.").

The record reflects that both Schandorf and Meade viewed Dr. M.'s misconduct, another Emcare-placed physician, as similar to Scott's misconduct.  Indeed, they both used the term "similar" in their deposition testimony to describe the complaints about the two

physicians. As Scott points out, there is even evidence suggesting that Dr. M.'s misconduct was more severe and serious than Scott's misconduct. Despite this evidence, Dr. M. was treated more favorably. He received counseling, was sent to anger management classes, and, after all of these attempts failed, provided a ninety-day termination notice.

The Hospital attempts to avoid any responsibility with respect to Dr. M.'s treatment because Meade relied entirely on Schandorf to handle the complaints about Dr. M. But if this logic is assumed and followed, it does not result in a favorable outcome for the Hospital. Schandorf testified that Dr. M. had angry outbursts, was sometimes threatening, and that nurses, among others, were afraid of him. Meade was aware of these complaints about Dr. M. but did not decide to have Dr. M. removed from the Hospital. A jury could find that Meade treated Dr. M. more favorably when Dr. M. arguably exhibited worse conduct in the Hospital than Scott. For example, a jury could question why Meade, on one hand, sat back and did nothing about Dr. M.'s outrageous conduct and then, on the other hand, demanded Scott's removal based on her behavior in the Hospital's HR office.

It is also important to note that it is entirely unclear in the record what exactly occurred in the HR office. The Court must assume Scott's version of the facts. And according to Scott, she may have been upset and her voice may have been loud but she was in an HR office where such behavior should be more accepting. Scott denies that she "made a scene."

In sum, Scott has pointed to sufficient evidence to establish that the Hospital treated Dr. M., a similarly-situated male, more favorably. The Hospital's argument that it had

nothing to do with Dr. M.'s discipline and punishment does not advance its position—the inaction with respect to Dr. M.'s conduct calls into question the true reason behind the Hospital's request to have Scott removed.

### C.      The Hospital's Argument That Scott Cannot Establish Pretext

The Hospital next argues that, even if Scott can establish a prima facie case of gender discrimination, Scott cannot rebut the Hospital's legitimate, non-discriminatory reasons for requesting her removal from the Hospital: Meade asked Emcare to remove Scott based on Scott's egregious conduct in the HR department "coupled with numerous contentious interactions with staff and patients" and lack of fit with the Hospital's culture of care.  The Court disagrees.

Scott may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the Hospital's proffered reasons.  *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (internal quotation marks omitted).  Notably, Scott may also use evidence that similarly-situated male employees were treated more favorably to establish both a prima facie case and pretext.  *See Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013) ("A typical means of establishing pretext is through comparator evidence.") (citing *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253, 1259 (11th Cir. 2001); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1563 n. 20 (11th Cir. 1987)).

Scott has sufficiently rebutted the Hospital's reasons for the same reasons that the Court discusses under the analysis related to Scott's prima facie case, i.e., that Meade chose

to treat Dr. M. more favorably by not seeking his removal from the Hospital, despite the fact that Dr. M. committed offenses that were arguably more severe than the past complaints about Scott and Scott's behavior in the HR office.  Notably, it is also disputed in the record whether Scott's behavior in the HR office was "egregious."  And the purported "numerous contentious interactions with staff and patients" is belied by the fact that Scott was never formally counseled on these incidents or provided with an opportunity to respond in any way.

Accordingly, the Hospital's motion is denied with respect to the gender discrimination claims.

## III.   Scott's Gender Discrimination Claims against Emcare

Emcare argues that Scott waived any gender discrimination claims against it because she never filed a charge of gender discrimination against Emcare and she acknowledged during her deposition that she was not pursuing such a claim against Emcare.  The Court agrees that Scott's claims against Emcare are premised solely on retaliation.  Indeed, Scott's response to Emcare's motion is silent on this issue and does not even attempt to argue that Scott has a gender discrimination claim against Emcare.  This tacit agreement is further proof that such a claim does not exist.  Accordingly, Emcare is granted summary judgment on any purported gender discrimination claims.

## IV.   Scott's Retaliation Claims against the Hospital and Emcare

Scott alleges that the Hospital's request to have her removed and Emcare's termination of her contract were motivated by the charge of discrimination she filed against the Hospital.  It is undisputed that the Hospital knew about Scott's charge of discrimination

against it at the time that Meade requested her removal from the Hospital approximately one week after she filed the charge. The Hospital and Emcare argue, however, that they are both entitled to summary judgment on Scott's retaliation claims.

### A.      Relevant Law

In order to establish a prima facie case of retaliation, Scott must show that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse employment action, and (3) there is a causal relationship between the protected activity and the adverse employment action. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). A plaintiff must also demonstrate "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013); *see also Smith v. City of Fort Pierce*, 565 F. App'x 774, 778 (11th Cir. 2014). Once a plaintiff establishes a prima facie case of retaliation, the employer has an opportunity to articulate a nonretaliatory reason for its action, which can then be rebutted by the employee by evidence of pretext. *See Brown*, 597 F.3d at 1181-82.

A plaintiff can establish a causal connection by showing that the defendant was "aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (internal quotation marks omitted). Generally, in the absence of other evidence, an employee can establish a causal connection by showing a "very close" temporal proximity between the protected activity and the adverse action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

### B.      Prima Facie Case

Here, Scott has clearly established a prima facie case against both the Hospital and Emcare; the record suggests that both were aware of her charge of discrimination at the time that she was removed from the Hospital and at the time that Emcare terminated her contract. Moreover, the temporal proximity is the essence of "very close" because the adverse actions occurred approximately one week after she filed her charge.

### C.      The Hospital's Argument That Scott Cannot Show Pretext

The Hospital's pretext argument is nearly identical to its pretext argument under the gender discrimination claims and fails for the same reasons.  The Hospital also contends that Scott's charge of discrimination had nothing to do with its decision to request her removal because it had planned on removing her *before* the charge was filed based on the past complaints against her.  There are disputed facts in the record on this issue.  There is evidence that, prior to the time that Scott filed the charge of discrimination, Meade was on the fence about removing Scott.  Moreover, the Hospital never formally counseled Scott about the past complaints.

It is also disputed whether Scott's behavior in the HR office was "outrageous." Finally, as already explained, the Hospital's reasons are contradicted by the more favorable treatment of Dr. M.  Accordingly, the Hospital's motion is denied with respect to Scott's retaliation claims.

### D.     Emcare's Argument That Scott Cannot Show Pretext

Emcare argues that it had legitimate non-discriminatory reasons to remove Scott from the Hospital and terminate Scott's contract with Emcare. Meade demanded Scott's removal, a directive that Emcare had to follow under its contract with the Hospital. Further, once Scott was removed at the Hospital's request, her contract with Emcare permitted her immediate termination. There is simply no evidence in the record that calls into question Emcare's actions. Scott may point to Emcare's different treatment towards Dr. M., but it is undisputed in the record that the Hospital did not demand Dr. M.'s removal. In other words, there is nothing to call into question the fact that Emcare had to remove Scott immediately upon the Hospital's demand.

In sum, with respect to Emcare, Scott does not point to any evidence of pretext. Notably, the charge of discrimination was not even against Emcare. Accordingly, Emcare is entitled to summary judgment on Scott's retaliation claims.

It is therefore **ORDERED AND ADJUDGED** that:

1.     Defendant Sarasota Doctors Hospital, Inc.'s Motion for Summary Judgment (Dkt. 64) is denied.

2.     EmCare, Inc.'s Motion for Summary Judgment (Dkt. 66) is granted.

3.      The Clerk is directed to enter final judgment in favor of Emcare, Inc. and

against Plaintiff.

**DONE** and **ORDERED** in Tampa, Florida on November 5, 2015.


_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2014\14-cv-1762.msj-gender-retaliation-employerissue-64and66.wpd