[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10763
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-01762-JSM-TBM


DR. MICHELLE G. SCOTT,

Plaintiff-Appellant,

versus

SARASOTA DOCTORS HOSPITAL, INC.,
a Florida corporation,
d.b.a. Doctors Hospital of Sarasota,
EMCARE, INC.,
a Foreign Profit Corporation doing business in the
State of Florida,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 8, 2017)

Before JORDAN, ROSENBAUM and JILL PRYOR, Circuit Judges.

PER CURIAM:

Dr. Michelle Scott appeals the district court's grant of summary judgment in favor of EmCare, Inc. and denial of her motion for a new trial following a jury verdict in favor of Sarasota Doctors Hospital, Inc. ("the Hospital"). After careful review, we affirm the district court's grant of summary judgment and denial of Scott's motion for a new trial.

Scott sued the Hospital for sex discrimination and both the Hospital and EmCare for retaliation under both federal and Florida law. *See* 42 U.S.C. §§ 2000e–2(a) and 2000e–3 (Title VII of the Civil Rights Act of 1964); Fla. Stat. § 760.10 (Florida Civil Rights Act).[1] The district court granted EmCare summary judgment on all Scott's claims against it, but the court allowed the claims against the Hospital to go to trial. At trial, the jury determined that the Hospital was not Scott's joint employer, ending the case.

On appeal, Scott argues that the district court erred by granting summary judgment to EmCare on her retaliation claim. We cannot agree because she failed to demonstrate that EmCare's legitimate nondiscriminatory reason for terminating her was pretextual. Scott also contends that the district court erred by denying her

---

[1] Scott also filed a sex discrimination claim against EmCare, but she abandoned this claim at her deposition and in any event does not appeal the district court's grant of summary judgment to EmCare on it.

motion for a new trial against the Hospital because the jury's verdict that the Hospital was not her joint employer went against the great weight of the evidence. But there was enough evidence supporting the verdict that the district court did not abuse its discretion in denying Scott's motion. Finally, she asserts that the district court abused its discretion by excluding the testimony of Dr. Tracy Vasile, a female doctor who alleged sex discrimination by the Hospital's CEO. Vasile's testimony would have had no effect on the jury's verdict, however, so any error by the district court was harmless. Accordingly, we affirm.

## I.    BACKGROUND

### A.    Facts Related to EmCare's Summary Judgment Motion

We begin by setting forth the facts relevant to EmCare's summary judgment motion. Scott is a hospitalist—a hospital-based primary care physician—who worked at the Hospital from November 2011 until she was removed in October 2013.[2] Although she worked at the Hospital, Scott was officially employed by EmCare,[3] a corporation that manages physician practice groups and contracts to provide hospitals with physicians.

---

[2] We set forth the facts regarding EmCare's decision to terminate Scott in the light most favorable to Scott on review of the district court's decision granting summary judgment to EmCare.

[3] Technically, Scott was employed by yet another entity, Inpatient Services of Florida, Inc., but the evidence taken in the light most favorable to Scott established that EmCare was also her employer.

Scott claimed that she was discriminated against on the basis of her gender. She asserted that after a vague complaint about her behavior and a disagreement with a colleague over the proper course of treatment for a terminally-ill cancer patient, the Hospital began looking to replace her. After the disagreement with her colleague, Scott was informed she would be replaced by a male doctor. He eventually reneged on his contract, and she was told she could stay. But Dr. Michael Schandorf, Scott's supervisor, later introduced her to another male doctor interviewing for her position. Schandorf explained to Scott that Bob Meade, the hospital's CEO, thought she did not fit the Hospital's culture.

Scott asserted that the real reason she was being treated unfavorably was because of her gender. Vasile, another female doctor, had been subject to similarly vague behavioral complaints. Vasile was then fired, apparently in part because she had not greeted Meade twice in the doctors' lounge. In contrast, a male doctor with reported behavior problems was given warnings and anger management classes to change his behavior before being fired with several months' notification.

Based on these interactions, Scott filed a Charge of Discrimination with the EEOC on September 23, 2013. Just ten days later—on October 3, 2013—Schandorf approached Scott and suggested she take an open position at a different hospital. When Scott asked Schandorf if he was aware of her Charge of Discrimination, he responded that he was not. Scott then went to the Hospital's

Human Resources (HR) department and asked a staffer if she was aware of the EEOC Charge.  The HR staffer was not aware of the complaint, and Scott told her to investigate it.  Scott acknowledged that she was upset during this meeting and might have raised her voice and spoken quickly.

After the visit from Scott, the HR staffer contacted her boss, who told Meade about Scott's visit.  According to Meade, the staffer reported that Scott went on a "tirade" and "absolutely explod[ed]" in HR.  Dep. of Robert Meade 70–72 (Doc. 66-13).[4]  Meade was already aware of the EEOC complaint.  Meade then called Joel Stern, EmCare's regional director, and insisted that Scott be terminated because Scott had screamed and acted hostile to an HR employee.  On the same call, Meade informed Stern of Scott's Charge of Discrimination.[5]  Shortly thereafter, Schandorf told Scott of Meade's decision and escorted her out of the Hospital.  Scott received a call the following day from an EmCare administrator informing her that she was terminated.[6]

---

[4] References to "Doc. __" refer to the numbered docket entries in the district court record of the case.

[5] Meade then sent Stern an email reflecting his request that Scott be terminated because of her behavior.

[6] EmCare has contended that it did not, in fact, terminate Scott because the company expected that she could continue to work at other EmCare facilities.  But given that EmCare sent Scott a letter stating that it was terminating their agreement and wishing Scott well in her future endeavors, the evidence viewed in the light most favorable to Scott shows that she was terminated from EmCare's employment.

EmCare claimed that it was required to remove Scott upon Meade's demand. EmCare's contract with the Hospital provided that EmCare must remove an employee from the Hospital immediately upon request by the Hospital's CEO. And under Scott's contract with EmCare, she could be terminated immediately if hospital authorities requested that she no longer provide services at their hospital.

## B.    Evidence Related to Scott's Motion for a New Trial

We now set forth the evidence elicited at trial relevant to Scott's motion for a new trial, which centers on her claim that the jury erred in finding that the Hospital was not her joint employer. There was evidence supporting that outcome. Scott's employment contract was with EmCare,[7] and EmCare was responsible for setting and remitting her pay, providing her benefits, and withholding her taxes. She was supervised by Schandorf, an EmCare employee. But Schandorf was also the Hospital's medical director and served on its medical executive committee. Patients were billed separately for services provided by the Hospital and Scott, and EmCare received the money for the services provided by Scott and other EmCare physicians. In addition, EmCare provided her malpractice insurance as well as her uniform.

But Scott introduced other evidence to show that she also had a relationship with the Hospital. Her practice was limited to the Hospital and used the Hospital's

---

[7] The Hospital employed only one doctor—a psychiatrist—and contracted out to companies like EmCare to provide all the other doctors.

6

facilities as well as its diagnostic and treatment equipment.  Scott also served on several of the Hospital's committees including the patient care review committee. In addition, Scott regularly had contact with Hospital employees but claims that she had contact with only one EmCare employee, Schandorf.

EmCare and the Hospital shared responsibility for hiring and overseeing Scott's work.  Schandorf, an EmCare employee, initially reviewed Scott's qualifications and recommended that the Hospital interview her for a position.  But only Hospital administrators interviewed Scott for the position.  Hospital administrators and Schandorf worked together to handle complaints against EmCare employees like Scott.  Scott once was removed from the case of a leukemia patient at a non-EmCare doctor's request after she disagreed with the doctor's treatment plan.  But a Hospital administrator testified that the Hospital lacked the authority to terminate Scott.

There was additional evidence at trial about Scott's termination, which, like the evidence at summary judgment, showed that EmCare terminated Scott at the request of the Hospital.  Scott's behavior had been a topic at prior Hospital staff meetings.  The concern was not with her clinical treatment but rather the way she was interacting with patients and Hospital employees.  Meade had previously directed his concerns over Scott's behavior to Schandorf.  After Scott's contentious

meeting in HR, Meade called and then wrote an email to EmCare requesting that Scott be removed from the Hospital.

## C.    Procedural History

After discovery, EmCare and the Hospital moved for summary judgment. The district court granted EmCare summary judgment because even viewing the evidence in the light most favorable to Scott, Scott had failed to demonstrate that EmCare's nondiscriminatory reason for firing her was pretextual.  But the district court denied the Hospital's motion for summary judgment, so Scott's claims against the Hospital went to trial.

During trial, Scott attempted to offer testimony by Vasile, a former doctor at the Hospital who would testify to her belief that she was mistreated by Meade because of her gender.  The Hospital argued this testimony was irrelevant to Scott's claims that she was discriminated and retaliated against by the Hospital. The district court excluded the testimony on relevance grounds.

Ultimately, the jury found that the Hospital was not Scott's employer and returned a verdict in favor of the Hospital.  Because the jury determined that the Hospital was not Scott's employer, it did not proceed to consider Scott's discrimination and retaliation claims.

Thereafter, Scott moved for a new trial under Federal Rule of Civil Procedure 59.  She alleged that the jury's verdict was against the great weight of

the evidence that the Hospital was her joint employer.  She also asserted that the district court's exclusion of Vasile's testimony warranted a new trial.  The district court denied her motion.

## II.    STANDARDS OF REVIEW

We review a district court's grant of summary judgment *de novo*.  *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute exists where a reasonable fact-finder could find by a preponderance of the evidence that the non-moving party is entitled to a verdict.  *Kernel Records*, 694 F.3d at 1300.  In determining whether evidence creates a factual dispute, a court should draw reasonable inferences in favor of the non-moving party, but "inferences based upon speculation are not reasonable."  *Id.* at 1301 (quotation omitted).

A district court's denial of a new trial is reversed only for abuse of discretion.  *Ramsey v. Chrysler First, Inc.*, 861 F.2d 1541, 1544 (11th Cir. 1988).  Reversal under this standard is proper only when the court so clearly abused its discretion that its action could be deemed arbitrary.  *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080 (11th Cir. 2016).  The denial of a new trial is proper when, after weighing the evidence, the district court cannot find that the

verdict is contrary to the great weight of the evidence. *Ramsey*, 861 F.2d at 1544.

Deference must be given to the judgment of the trial judge, who observed the

witnesses and considered the evidence "in the context of a living trial." *Id.*

Finally, we review a district court's evidentiary rulings for an abuse of

discretion. *Proctor v. Fluor Enter., Inc.*, 494 F.3d 1337, 1349 n.7 (11th Cir. 2007).

"To gain a reversal based on a district court's evidentiary ruling, a party must

establish that (1) its claim was adequately preserved; (2) the district court abused

its discretion in interpreting or applying an evidentiary rule; and (3) this error

affected a substantial right." *Id.* at 1349.

## III.    DISCUSSION

**A.    Summary Judgment**

Scott appeals the district court's grant of summary judgment to EmCare on

her retaliation claim.  The court concluded that Scott had produced no evidence

that EmCare's legitimate, nondiscriminatory reason for removing her from her

position at the hospital and terminating her were pretextual.  We agree and affirm

the district court's grant of summary judgment.

Title VII prohibits an employer from retaliating against an employee

because the employee "opposed any practice" made unlawful by Title VII.  42

U.S.C. § 2000e–3(a).[8]  Absent direct evidence of discrimination, when analyzing

claims for retaliation, we employ the framework set forth by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Bryant v. Jones*,

575 F.3d 1281, 1307 (11th Cir. 2009).  Under this framework, the plaintiff must

first establish a *prima facie* case of retaliation.  *Id.*  In order to establish a *prima*

*facie* case of retaliation, a plaintiff may show that: (1) she engaged in a statutorily

protected activity; (2) she suffered a materially adverse action; and (3) she

established a causal link between the protected activity and the adverse action.  *Id.*

at 1307–08.  Once a plaintiff establishes a *prima facie* case of retaliation, the

burden shifts to the defendant to rebut the presumption by articulating a legitimate,

non-discriminatory reason for the adverse employment action.  *Id.* at 1308.  The

plaintiff then has an opportunity to demonstrate that the defendant's proffered

reason was pretext for discrimination.  *Id.*  The plaintiff must also show that the

protected activity was a "but-for" cause of the adverse employment action.  *Univ.*

*of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

　　Here, Scott made out a prima facie case of retaliation against EmCare.[9]  We

conclude that Scott engaged in a statutorily protected activity by filing a sex

discrimination charge against the Hospital with the EEOC.  EmCare contends that

---

[8] Decisions construing Title VII guide the analysis under the Florida Civil Rights Act.
*Holland v. Gee*, 677 F.3d 1047, 1054 n.1 (11th Cir. 2012).

[9] There is no question that Scott suffered a materially adverse action when EmCare
terminated her employment.

the Hospital was not Scott's employer, so filing a charge against it was not a protected activity.  But Title VII makes it unlawful for an employer to "discriminate against *any individual* with respect to his compensation, terms, conditions, or *privileges of employment*."  42 U.S.C. § 2000e–2(a) (emphasis added).  Citing this language, we have extended Title VII to situations where a defendant has interfered with an individual's employment relationship with a third party.  *See Pardazi v. Cullman Med. Ctr.*, 838 F.2d 1155, 1156 (11 Cir. 1988) (concluding that Title VII covered a doctor's claim that a hospital discriminated against him in denying him privileges which interfered with his employment at a separate corporation).  Thus, Scott's Charge of Discrimination against the Hospital—even if ultimately unsuccessful at trial—was cognizable under Title VII, so filing it was certainly a protected activity.  *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) (recognizing that Title VII protects individuals from retaliation "regardless of the merit of [their] complaints so long as [they] can show a good, faith, reasonable belief that the challenged practices violate Title VII").[10]

We also conclude that Scott established a causal link between filing the charges of discrimination and being terminated by EmCare.  Close temporal

_____

[10] Nor does it matter that Scott's "protected activity" related to the Hospital rather than EmCare because Title VII covers all protected activity.  *See McMenemy v. City of Rochester*, 241 F.3d 279, 284–85 (2d Cir. 2001) (concluding that Title VII protected an employee from retaliation by a future employer for protected activity relating to his former employer).

proximity between an employee's protected conduct and the adverse action is generally sufficient to create a genuine issue as to whether there is a causal connection. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006). The Supreme Court has indicated that the temporal proximity between an employer's knowledge of protected activity and an adverse action must be very close. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Here, Scott filed her Charge of Discrimination on September 23 and she informed her EmCare supervisor of the charge ten days later on October 3. EmCare terminated her employment the following day. The very close temporal proximity between EmCare learning of Scott's complaint and firing her sufficed to establish a causal link.

Because Scott established a *prima facie* case of discrimination, the burden shifted to EmCare to articulate a legitimate, non-discriminatory reason for firing Scott. *Bryant*, 575 F.3d at 1308. EmCare explained that it terminated Scott at the request of the Hospital because she acted inappropriately in HR. On October 3, Meade called (and subsequently emailed) Stern requesting that Scott be removed from the Hospital because of the way she treated an HR staffer.[11] Pursuant to

---

[11] Whether Scott actually behaved inappropriately in HR and mistreated an HR staffer is disputed, but Scott does not dispute that Meade told Stern as much and requested her termination. Nor does she dispute that Stern believed Meade's explanation. We are not entitled to second-guess non-discriminatory business judgments, even those potentially based on erroneous facts. *Flowers v. Troup Cty. Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015).

13

EmCare's contract with the Hospital, the company was required to accede to that request. And pursuant to EmCare's contract with Scott, EmCare was entitled to terminate her at that time. The burden thus shifted back to Scott to demonstrate that this reason was pretextual. *Id.* The district court concluded that she failed to carry this burden.

On appeal, Scott raises two arguments why the district court was incorrect. First, she points to a case in which the Seventh Circuit held that an Indiana law permitting long term care residents to choose their providers did not override a long term care facility's obligation to follow federal nondiscrimination law where the residents made race-based provider requests. *See Cheney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 914 (7th Cir. 2010). By analogy, she argues, a contractual provision requiring EmCare to accede to the Hospital's request to remove her did not relieve it of the obligation not to retaliate against Scott for engaging in a protected activity, especially since EmCare knew of the protected activity here. Second, Scott directs our attention to a recent Fifth Circuit case applying a Supreme Court decision on "cat's paw" discrimination in the retaliation context. *See Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752 (5th Cir. 2017) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). Under a cat's paw theory, which this Court has recognized in other contexts, "an employer could be liable when the decision-maker has no [retaliatory] animus but is influenced by a subordinate

14

supervisor's action that is the product of such [retaliatory] animus." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013).  Here, Scott argues that EmCare was essentially a cat's paw for the Hospital and its retaliatory animus against her. While these arguments are intriguing, Scott did not raise them or anything resembling them before the district court, so she waived them.  *See Stavropoulos v. Firestone*, 361 F.3d 610, 616 n.6 (11th Cir. 2004) ("[Plaintiff] did not present this theory to the district court when summary judgment motions were pending. . . . Because [plaintiff] failed to properly present her [new] theory to the district court, we decline to consider it on appeal."), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Instead, Scott argued in her response to the summary judgment motion that the close temporal proximity between her complaint and termination demonstrated that EmCare's reason was pretextual.  Like the district court, we cannot agree in light of EmCare and the Hospital's contract and absent the cat's paw theory Scott brought up on appeal.  "Provided that [an employer's] proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."  *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010).  "To show pretext, [an employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find

them unworthy of credence." *Id.* at 1265 (internal quotation marks omitted).  In relying on temporal proximity alone, Scott failed to adequately rebut EmCare's nondiscriminatory reason for firing her.  Therefore, we affirm the district court's grant of summary judgment to EmCare.

## B.    Motion for a New Trial

Scott also appeals the district court's denial of her motion for a new trial.  In this motion, she argued that the jury's verdict that the Hospital was not her joint employer was against the great weight of the evidence.  The district court disagreed, concluding that the verdict was supported by ample evidence.  On appeal, Scott contends that the district court abused its discretion in denying her motion because the evidence at trial showed that the Hospital was responsible for her hiring, supervision, and firing and that she performed integral hospital functions.  Although there was evidence at trial to support the conclusion that the Hospital was Scott's joint employer, there was also significant evidence to the contrary.  Thus, the district court did not abuse its discretion when it determined that the jury's verdict was not against the great weight of the evidence.

The first (and ultimately only) question before the jury was whether the Hospital was Scott's joint employer because only employers are subject to Title VII liability.  *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995).  Under Title VII, an "employer" is defined as "a person engaged in an industry affecting

commerce who has fifteen or more employees . . . and any agent of such a person."
42 U.S.C. § 2000e(b).  Title VII defines an "employee" merely as "an individual
employed by an employer[.]"  42 U.S.C. § 2000e(f).  The Supreme Court has
recognized that Congress's use of such a "nominal definition" to define the term
"employee" showed that Congress intended to "describe the conventional master-
servant relationship as understood by common-law agency doctrine."  *Clackamas
Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 444–45 (2003) (internal
quotation marks omitted).

We have recognized that multiple entities can serve as "joint employers" for
Title VII purposes.  *See Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359–
61 (11th Cir. 1994) (upholding district court's determination after bench trial that
two entities were joint employers).  And we have liberally interpreted the term
"employer" consistent with Title VII's purposes.  *Id.* at 1359.  As jointly requested
by the parties, the district court instructed the jury using the Eleventh Circuit's
pattern joint employers instruction, which laid out 11 factors for them to consider:

> Was Dr. Scott an employee of Doctors Hospital as well as an
> employee of EmCare, Inc.?  You should answer this question in
> light of the economic realities of the entire relationship between
> the parties based on the evidence.
>
> Consider all the following factors to the extent you decide that
> each applies to this case:
>
> > (a)    the nature and degree of control over the employee
> >        and who exercises that control;

17

(b)     the degree of supervision, direct or indirect, over the employee's work and who exercises that supervision;

(c)     who exercises the power to determine the employee's pay rate or method of payment;

(d)     who has the right, directly or indirectly, to hire, fire, or modify the employee's employment conditions;

(e)     who is responsible for preparing the payroll and paying wages;

(f)     who made the investment in the equipment and facilities the employee uses;

(g)     who has the opportunity for profit and loss;

(h)     the employment's permanence and exclusiveness;

(i)     the degree of skill the job requires;

(j)     the ownership of the property or facilities where the employee works;

(k)     the performance of a specialty job within the production line integral to the business.

Consideration of all the circumstances surrounding the work relationship is essential.   No single factor is determinative. Nevertheless, the extent of the right to control the means and manner of the worker's performance is the most important factor.

Eleventh Circuit Civil Pattern Jury Instruction 4.25 (2013).

Considering these factors,[12] the jury's verdict was not against the great

weight of the evidence.  The Hospital elicited ample evidence at trial that it was

---

[12] "[T]his Circuit's pattern instructions, while a valuable resource, are not binding law." *United States v. Carter*, 776 F.3d 1309, 1324 (11th Cir. 2015).  This Court has previously articulated a somewhat different set of factors to determine whether an employment relationship exists in the Title VII context.  *See Pardazi v. Ullman Med. Ctr.*, 838 F.2d 1155, 1156 (11th Cir. 1988).  But both parties requested the pattern joint employer instruction given here and both parties frame their argument about the jury's verdict around the pattern instruction.  Therefore, we will consider the evidence in light of this instruction.  In any event, we believe that the factors listed in the pattern instruction fairly target "the economic realities of the [employment] relationship viewed in light of the common law principles of agency and the right of the

not Scott's joint employer.  Testimony established that Scott's immediate

supervisor, Schandorf, was an EmCare employee, who exercised control over her

consistent with factors (a) and (b).  Indeed, complaints about Scott's behavior were

directed to Schandorf.  Moreover, it was EmCare, rather than the Hospital, that was

responsible for Scott's pay, benefits, malpractice insurance, and taxes under factors

(c) and (e).  Relatedly, EmCare billed patients for its doctors' services, so only

EmCare could profit from or lose money on its doctors' services pursuant to factor

(g).  And while the Hospital had the power to order Scott's removal, only EmCare

had the power to actually terminate her employment under factor (d).

Scott correctly points out that she elicited plenty of evidence that the

Hospital was her joint employer.  The incident with the leukemia patient

demonstrated that the Hospital supervised her and controlled her activities, such as

which patients she could treat, consistent with factors (a) and (b).  Before she was

hired, Scott interviewed with the Hospital—not EmCare—administrators under

factor (d).  Relevant to factor (k), Scott was in the core group of doctors at the

Hospital, caring for patients and serving on hospital committees, both of which

were integral to the Hospital's functioning.  And the Hospital invested in, owned,

and provided the vast majority of the equipment and facilities that Scott utilized

---

employer to control the employee," which is the ultimate inquiry when determining whether an employment relationship existed. *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11th Cir. 1982).

under factors (f) and (j).  Although Scott's evidence was substantial, we cannot say that the jury's verdict was contrary to the great weight of the evidence given the Hospital's conflicting evidence.

Scott argues that a recent Fourth Circuit case concerning joint employers demonstrates how badly the jury here misconceived the evidence.  In *Butler v. Drive Automotive Industries of America, Inc.*, the Fourth Circuit ruled that a manufacturer was the plaintiff's joint employer as a matter of law even though she was technically employed by a staffing company.  793 F.3d 404, 415 (4th Cir. 2015).  *Butler* is similar to Scott's case.  For example, the Fourth Circuit found it significant that an employee of the manufacturer "sent an email to . . . a[] [staffing company] employee, directing that [plaintiff] be added to the list for replacement. [The staffing company] then, after a delay, terminated [the plaintiff].  Although [the staffing company] was the entity that formally fired [the plaintiff], [the manufacturer] had effective control over [her] employment."  *Id.*  Those events are akin to Meade's email to EmCare, which resulted in Scott's firing.  Also similar to Scott, the plaintiff in *Butler* used the same equipment as the manufacturer's employees and produced the goods that were the manufacturer's core business. *See id.*

But there are important differences between the two cases.  For example, the manufacturer's employees supervised the *Butler* plaintiff on the factory floor.  *See*

20

*id.*  Here, Scott was supervised by an EmCare employee.  Further, the *Butler* plaintiff performed the same tasks as the manufacturer's employees, whereas all hospitalists like Scott were EmCare employees.  Given these differences, *Butler* does not convince us that the jury here rendered a verdict against the great weight of the evidence.[13]  *Cf. Ling Nan Zheng v. Liberty Apparel Co. Inc.*, 617 F.3d 182, 185–86 (2d Cir. 2010) (holding that joint employment determination was a complex mixed question of law and fact properly determined by jury).

The relationship between Scott and the Hospital was complex and difficult to classify.  Both parties marshalled convincing evidence in support of their positions, and the jury reasonably could have come to the opposite conclusion.  But deciding these hard questions "is precisely what juries are for."  *J & H Auto Trim Co., Inc. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1376 (11th Cir. 1982).  We agree with the district court that the jury's verdict was not against the great weight of the evidence, so the court's denial of Scott's motion for a new trial was not an abuse of discretion.  *Ramsey*, 861 F.2d at 1544.

---

[13] Scott also directs our attention to *Browning-Ferris Industries of California, Inc.*, in which the NLRB updated its joint employment framework and determined that Browning-Ferris was a joint employer of a staffing company's employees.  362 N.L.R.B. No. 186, 22 (2015).  Like *Butler*, this NLRB case shares similarities with Scott's case but also has some important differences.  In any event, the NLRB's decision does not convince us that the jury in Scott's case rendered a verdict against the great weight of the evidence.

C.    **Evidentiary Challenge**

Finally, Scott appeals the district court's decision to exclude Vasile's testimony as irrelevant. Before the district court, Scott argued that Vasile's testimony was relevant to her discrimination claim because Vasile was another female doctor whom the Hospital treated differently than her male colleagues. On appeal, Scott repeats this argument but also contends that Vasile's testimony was relevant to Scott's argument that the Hospital was her joint employer because Vasile would testify about the control the Hospital exercised over Vasile's employment. Scott did not make this latter relevance argument below, however, and she is not entitled to adopt a new theory of relevance on appeal. *See F.D.I.C. v. Verex Assur., Inc.*, 3 F.3d 391, 395 (11th Cir. 1993) ("By well settled convention, appellate courts generally will not consider an issue or theory that was not raised in the district court."). As to Scott's argument that Vasile's testimony was relevant to the Hospital's disparate treatment of women, Scott cannot demonstrate that excluding Vasile's testimony affected her substantial rights in light of the jury's verdict that the Hospital was not Scott's joint employer. *See Proctor*, 494 F.3d at 1349. Accordingly, we affirm the district court's ruling.

## IV.    CONCLUSION

Upon review of the entire record on appeal, and after consideration of the parties' briefs, we affirm.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 08, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 16-10763-EE
Case Style: Michelle Scott v. Sarasota Doctors Hospital, Inc, et al
District Court Docket No: 8:14-cv-01762-JSM-TBM

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellant.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Elora Jackson, EE at (404) 335-6173.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs